[No. 15018. *En Banc.* December 16, 1919.]

## CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, *Appellant,* v. FRYE & COMPANY *et al., Respondents.*[1]

CARRIERS (47)—LIVE STOCK—RATES—CONTRACTS—CONSTRUCTION—RESHIPMENTS FROM CONCENTRATION POINTS. Under a tariff contract for the shipment of hogs in single-deck cars to concentration points and billed through, but to be reshipped without rebilling for a long haul in double-deck cars in the ratio of three for each two single-deck car loads, the company cannot recover on the basis of the number of single-deck cars, where, owing to underloading thereof, there were more single-deck cars than three to each two double-deck car loads; but can only recover for the services rendered, which would be the local rate to concentration points on the excess of single-deck cars.

SAME (47)—LIVE STOCK—RATES—ABANDONED CARS AT CONCENTRATION POINTS. In the absence of a tariff provision covering the matter of freight shipped to concentration points, but billed through and reshipped without rebilling for a long haul in a less number of cars, the company can recover only the reasonable value of the services, which would be the local rate to concentration points upon cars there abandoned.

SAME (47)—LIVE STOCK—RATES—CONTRACT—ADDITIONAL SWITCHING CHARGES. A contract naming the tariff on through shipments of stock to be delivered at a point where the company had no terminals does not entitle the company to collect, in addition, switching charges, where the shipper stood ready to accept delivery at any point in the city, and the company elected to deliver at the shipper's yards because the switching was less expensive than at other points.

LIMITATION OF ACTIONS (38-1) — ACCRUAL — "OPEN ACCOUNTS." There was no "mutual, open and current account" between a shipper and a carrier, within the meaning of Rem. Code, § 166, tolling the

[1]Reported in 186 Pac. 668.

statute of limitations, where shipments were made during a period of years, and bills were presented from time to time, and the shipper refused to pay particular items or paid less than the amount claimed on disputes and misunderstandings arising as to the amounts due on the shipments.

COMMERCE—INTERSTATE RATES—EFFECT ON STATE STATUTE OF LIMITATIONS. The interstate commerce law requiring a carrier to collect rates fixed by the tariffs without discrimination does not defeat the operation of state statutes of limitations on the ground that interposition of the statute would nullify the Federal act.

LIMITATION OF ACTIONS (17-1)—IMPLIED CONTRACTS NOT IN WRITING—FREIGHT TARIFFS. An action by a carrier to recover freight charges provided by the published tariffs required by the interstate commerce law, arises on contract, express or implied, which, if the contract is not in writing, must be commenced within three years under Rem. Code, § 159; and is not a statutory action which would be barred in two years, notwithstanding the terms of an interstate shipping contract are largely fixed by law (HOLCOMB, C. J., dissenting).

Cross-appeals from a judgment of the superior court for King county, Jurey, J., entered April 10, 1918, upon findings favorable to the defendant, in an action by a carrier to recover freight charges, tried to the court. Affirmed.

*Geo. W. Korte* and *C. H. Hanford,* for appellant.

*Higgins & Hughes* (*Hyman Zettler,* of counsel), for respondents.

TOLMAN, J. — The plaintiff sues to recover money alleged to be due for freight on shipments of hogs, cattle, and corn accompanying for feeding purposes, and switching charges accruing during the years 1909 to 1914, both inclusive. Both parties have appealed from the judgment below, and to avoid confusion will be referred to as plaintiff and defendant, respectively. It was announced on oral argument here that the matters in dispute as to the freight on corn, which accompanied the shipments of stock for feeding purposes,

had been adjusted, and therefore that matter will not be further considered or referred to herein.

The questions now to be determined, are:

(1) What was the legal rate to charge as freight on the shipments of hogs?

(2) What was the legal rate to be charged as freight on the shipments of cattle?

(3) Is the plaintiff entitled to charge and collect switching charges, or is that a part of the service covered by the through rates?

(4) Do the transactions shown constitute a mutual, open and current account with reciprocal demands between the parties, as defined in our statute, Rem. Code, § 166?

(5) Is the statute of limitations applicable, and if so, to what extent?

I. To determine what was the legal rate to be charged as freight on the shipments of hogs, the tariffs established by the plaintiff and filed with the interstate commerce commission must be considered in the light of the transactions as shown by the evidence. It appears that defendant and its predecessors had been, for a number of years, engaged in the operation of a slaughtering and packing business in the city of Seattle, and was a large shipper of live stock from points where produced to its plant, and prior to the transactions herein involved, it had purchased such live stock in territory not entered by plaintiff's road, and shipped by other lines. The plaintiff, having opened up a large territory in the Dakotas, and by its through line made shipments therefrom to Seattle feasible, sought the defendant's business, and to procure it established and duly filed certain tariffs, among others, a tariff for the shipment of hogs which provided for concentration points in South Dakota; for through rates from all loading points east of, and in

the same zone as, the concentration points, to Seattle, of $170 for each single-deck car, with the privilege of unloading, feeding and concentrating at such concentration points, and reloading in double-deck cars in the ratio of three single-deck cars to two double-deck cars, the rate on the double-deck cars to be, for each two, three times the rate on one single-deck car, and also established, by the same means, local rates from the loading places to the concentration points.

The practical operations, as found by the trial court, and as established by the evidence, are substantially these: Defendant placed buyers at the concentration points, who, by telephone or letter, communicated with producers at the various loading stations, and induced them to ship their hogs in single-deck cars billed to defendant at Seattle, but with directions to unload and feed at one of the concentration points, the shipper signing a live stock contract. When the car so billed reached the concentration point, it was unloaded in plaintiff's stock-yards, and its contents commingled with the hogs arriving from other loading points, so that the identity of each initial shipment was then lost. After feeding and resting, and as sufficient hogs were assembled, they were reloaded in double-deck cars and carried through in train-load lots to Seattle. These double-deck cars were each loaded to the required weight, each two equal to the load of three single-deck cars, but not overloaded, from the common pen, without regard to the number of single-deck cars in which the hogs had actually arrived, and were sent on to Seattle without rebilling, on the way-bills previously issued on the single-deck cars at the station where loaded, each two double-deck cars carrying with them way-bills for three single-deck cars, and earning the freight rate of such three single-deck cars from the loading point to Seattle.

Because of the partially developed hog industry, it was not always possible to secure full single-deck carloads at the loading points, and in many instances, on account of such under loading and small cars, the actual contents of four or more single-deck cars were put into two double-deck cars at the concentration points, without, in fact, loading such double-deck cars beyond what the tariff called for, *i. e.,* three single-deck car-loads in two double-deck cars. This resulted in an excess of single-deck cars, over the ratio of three to two, at the concentration points, all billed to Seattle, and each billed with the tariff freight rate through to Seattle, but none of which traveled beyond the concentration point, their loads having gone on in the double-deck cars without overloading.

The way-bills for these extra cars were sent on to Seattle, presented to the defendant, with a demand for payment of the through rate on each, and payment being refused, they form the basis for plaintiff's demand on this branch of the case. The defendant in the beginning claimed that nothing whatever was due the plaintiff upon these excess cars, but finally an adjustment was reached by which it was mutually agreed that defendant should pay the local rates from the loading point to the concentration point upon each of these excess cars; but the plaintiff's accounting department repudiated this agreement, and by this action it is sought to establish a construction of the tariff which will require the payment of $170 for each single-deck car billed from any loading point to Seattle, notwithstanding that it traveled only to a concentration point, and regardless of the ratio in which the contents of such cars were reloaded into double-deck cars at the concentration points.

Experts testified upon each side as to the proper interpretation of the tariff, and after a full consider-

ation of such testimony, we are inclined to approve and adopt the view taken by the trial court so clearly expressed in his memorandum opinion, as follows:

"I think, upon the whole record, the tariffs in question were framed to meet a condition existing in the locality in question—a sparsely settled country where it was frequently and usually impossible to procure a full single-deck car load of hogs at any one loading station. This made the concentrating feature of the tariff at concentrating points most convenient to the loading points and re-loading in double-deck cars for the long haul to Seattle a matter of necessity to the handling of such shipments. Plaintiff's interpretation of the law renders this agreement of no benefit to the shipper, although it is conceded that the arrangement was for the benefit of the shipper. Defendant's contention in this regard is certainly the most equitable, reasonable and practical, and if not illegal, should be accepted. As to the legality of the arrangement contended for by defendants, I think the defendants have the advantage in expert testimony, especially in view of the fact that one of plaintiff's experts, the author of the tariffs in question and who knew the conditions the tariffs were made to fit, at first interpreted the tariff as defendants contend for, and was one of the responsible parties for the compromise agreement, and such agreement was based upon his interpretation of the tariff at that time. I think, also, the same result is arrived at from an entirely different view of the matter. It is conceded the service and not the billing or bill of lading is the basis of the freight charges. The plaintiff's contention in this regard is based upon the billing and bill of lading rather than the service actually rendered. Take, for example, the case of three full single-deck car load lots shipped in four single-deck cars from the loading point to the concentration point, and there re-loaded into two double-deck cars and forwarded to Seattle, which is a fair example of the subject of the controversy on this question. It will be conceded that the service called for and undertaken, according to the billing and bills

of lading, was to haul four single-deck cars from the loading point through to Seattle. Though plaintiff admits that this service was not rendered, yet it is for this specific and identical service that it demands payment rather than for the substituted service, which was actually rendered—the hauling of four single-deck cars from the loading point to the point of concentration, and there re-loaded into two double-deck cars and forwarded to Seattle, thus abandoning one single-deck car at concentration point. The full local rate on the abandoned car seems to me all that plaintiff could properly claim.''

II.   Practically the same questions are involved in the matter of freight on cattle, except that there is no tariff provision for concentration at particular points, or at all. As a matter of fact, concentration was permitted and the extra car was abandoned at the point where the concentration was made. In the absence of any tariff provision covering the matter, the plaintiff would be entitled to receive the reasonable value of the service rendered, and we uphold the trial court in its holding that the reasonable value of the service was the through rate on the loads which were shipped through, and the local rate on the abandoned car from the loading point to the point where the car was unloaded and abandoned.

III.   Plaintiff seeks to recover for switching charges which it alleges it paid to another company for switching the cars containing the live stock shipped to the defendant, from its own line in Seattle to the defendant's yard. It is an admitted fact that the plaintiff had no terminal facilities of its own for the delivery of live stock in Seattle, and yet it had undertaken to make delivery at Seattle. Defendant, in writing, advised the plaintiff that it was ready to accept delivery at any point in Seattle where delivery could properly be made, and, under the circumstances,

the plaintiff voluntarily elected to make delivery at the defendant's yards, as being less expensive to it than making delivery at any other yards in Seattle. So that, excepting for the three cars resting upon a different state of facts, for the switching of which defendant admits a liability of $9, we hold that the plaintiff was compensated for this service by the through rate and is not entitled to recover switching charges in addition thereto.

IV.   The plaintiff's complaint is framed upon the theory that this is a mutual, open and current account, and therefore the statute begins to run only from the last item.   It may be admitted that the services were sufficiently continuous, but we see little else to bring it within the statute.   The course of dealing is shown by a witness produced by plaintiff, who said, in effect, that as the shipments were received by defendant, the freight bills were presented and the defendant paid such of them, or such parts of them, as it admitted to be correct, and any that were disputed were rejected and returned unpaid to the collector; that no credit was allowed to be extended, and no credit was extended; but the simple fact that, from time to time, there were disputes or misunderstandings as to the amount due upon a freight shipment, and the defendant refused to pay a particular item, or paid less than the amount claimed, and that this is an action embracing all such separate and individual items, does not make it "a mutual, open and current account" within the statute.   *Garey v. Pasco,* 89 Wash. 382, 154 Pac. 433; 1 R. C. L. 205; 1 C. J. 598.

V.   The final question in the case, and the one to which each party has given most of its attention, is the application of the statute of limitations.

It is argued that, because the interstate commerce law requires a carrier to collect, and a shipper to pay,

the rates fixed by the tariffs, and forbids any manner of discrimination in favor of or against any shipper, the interposition of the statute nullifies the intent of the Federal law and permits its purpose to be set at naught. This question has been recently considered and the authorities reviewed by the circuit court of appeals for the eighth circuit, in *Chicago & N. W. R. Co. v. Ziebarth,* 245 Fed. 334, and resolved against the plaintiff's contention, and we are content to follow the rule there laid down.

Since, then, the state statute applies, within what provision of that statute do these matters fall? The six-year provision relates to an action upon a contract in writing, or to liability arising out of a written contract. If we properly grasp the facts here involved, this provision of the statute does not apply, because the only written contracts in anywise relating to the payments of freight charges shown by the record are the live stock contracts signed by the shipper of the hogs at the loading points, by the terms of which such shipper agreed to pay the tariff rate from the loading point to Seattle. Defendant was not a party to any such contract, and even though it were a party thereto, as we have already seen, that contract was not carried out in the particular instances which give rise to this litigation, but the loads of such cars were transferred properly to double-deck cars, which carried the through rate from the loading points to Seattle, in the ratio of three single-deck cars to two double-deck cars, and the through freight thereon was paid on presentation of the way-bill, leaving unpaid only the local rate on the excess single-deck cars from the loading station to the point of concentration. There being no written contract covering this local service or the local rate, it would seem to fall under

subd. 3, § 159, Rem. Code, as a contract or liability, express or implied, not in writing.

While it may be admitted that, under the interstate commerce law as it now stands, the terms of a contract between a shipper and a carrier are largely fixed by law, yet, notwithstanding that fact, a contract is entered into between the parties whenever the one delivers his goods to the other and the latter accepts them for transportation, and the limitation period is to be determined from the fact that the parties reduce their agreement to writing or permit it to rest in parol, and such is the meaning of this court in *Oregon-Washington R. & Nav. Co. v. Seattle Grain Co.*, 106 Wash. 1, 178 Pac. 648, and since the relations between the shipper and the carrier are contractual, the matter of freight rates cannot fall within the two-year limitation.

From what has been said, it follows that the trial court was right in all except the application of the two-year statute of limitations, and erred only in not applying the three-year statute.

The question of the freight on corn having been eliminated, it would appear from the record that this error does not affect the results, since the last delivery of hogs was made on September 21, 1911, and the last delivery of cattle made on June 30, 1911, and this action was not commenced until August 13, 1915.

The judgment of the trial court will therefore be affirmed.

PARKER, MACKINTOSH, BRIDGES, MOUNT, MITCHELL, MAIN, and FULLERTON, JJ., concur.

HOLCOMB, C. J. (concurring)—I fully concur in the foregoing opinion in all things except the reasoning and the ruling upon the application of the proper statute of limitations. The *Ziebarth* case cited, and

other Federal cases, declare the obligations arising
between the parties are purely statutory and in no-
wise contractual. Hence, manifestly the two-year
statute of limitations, and not the three-year, should
apply.