STATE OF OKLAHOMA
v.
UNITED STATES.
Cong. No. 10–55.

United States Court of Claims.
June 3, 1959.

**350**

LeRoy Powers, Oklahoma City, Okl., for plaintiff.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LARAMORE, Judge.

This case comes before the court pursuant to H. Res. 278, 84th Congress, 1st Session. The resolution refers to this court H.R. 5421, entitled "A bill for the relief of the State of Oklahoma," with instructions to make findings of fact and conclusions "sufficient to inform the Congress of the nature and character of the demand, as a claim legal and equitable against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

The claim of the State of Oklahoma arises out of a settlement agreement entered into between the United States and the State of Oklahoma in the case of United States v. Phillips, D.C.N.D.Okl., 33 F.Supp. 261. The facts necessary for a determination of the issue as to whether a legal or equitable claim exists against the United States are as follows:

In 1935, by an act of the Oklahoma State legislature, the Grand River Dam Authority was created for the purpose of impounding the waters of the Grand River in that State for flood control, production of hydroelectric energy and other useful and related purposes. 82 O.S.1951 § 861 et seq. The Grand River Dam Authority, hereinafter referred to as the "Authority," was declared to be a governmental agency, a conservation and reclamation district, and was given broad powers to acquire property, construct, maintain, use and operate facilities, to borrow money, issue negotiable bonds, pledge its revenues and sell and distribute the electric energy generated. The Authority was governed by a board of nine directors, three of whom were appointed by the Governor, three by the Attorney General of Oklahoma and three by the State Commissioner of Labor. On October 16, 1937, the Authority entered into an agreement with the United States, acting through the Federal Emergency Administration of Public Works, whereby the latter agreed to aid in financing the construction of a dam on the Grand River by making a grant to the Authority in a sum not to exceed $8,437,000 and by purchasing $11,563,000 of the Authority's revenue bonds. In 1939, the Federal Power Commission issued an order finding that the Authority was a public corporation created and existing under the laws of the State of Oklahoma for the purposes above described and, pursuant to the Federal Water Power Act, 41 Stat. 1063, 1077, as amended, 16 U.S.C.A. § 792 et seq., authorized the issuance of a license for the construction of a dam on the Grand River. A provision of the license agreement which was accepted by the board of directors of the Authority provided that the United States was not to be liable for damages occasioned to the property of others by the construction, operation, or maintenance of the project.

Sometime during the construction of the Grand River Dam a controversy arose between the Authority and the Oklahoma State Highway Commission centering around damages to which the State claimed to be entitled for injury to its roads by reason of the creation of a dam and reservoir and resultant inundation of the surrounding area. A

meeting was held between the Authority and the State Highway Commission at which time consideration was given to the construction of a certain bridge, called Grove Bridge, by the Authority at an expense of approximately $350,000 in return for which the State Highway Commission would waive all claims it might have against the Authority for damage to State roads by reason of the dam reservoir. The evidence is conflicting as to whether an agreement was actually reached between the two parties. However, the Authority did construct the Grove Bridge at a cost of $364,083, but no record of any agreement is recorded in the minutes of either the State Highway Commission or the Authority and it apparently was never acted upon by either at a regular meeting with a majority of members present.

Some time in 1939 a new Governor took office in Oklahoma and a new State Highway Commission was appointed. These authorities denied the existence of an alleged agreement respecting the construction of a bridge in return for the waiver of damages, and asserted a claim against the Grand River Dam Authority in the amount of $1,661,000. Conferences were held between the Authority and the State Highway Commission to discuss the issue, but nothing came of them since the Authority insisted an agreement had already been made, while the State Highway Commission stood steadfastly by its position that no valid agreement had actually been entered into. The Federal Works Agency, which had purchased the Authority's bonds, supported the Authority in the dispute since their bonds conceivably would be seriously weakened if it became necessary for the Authority to borrow additional funds to meet the demands of the State Highway Commission. The Federal Works Agency communicated its views to the Authority with the advice that if the dispute could not be settled the Authority should make arrangements to have a proper court settle it.

As the dam neared completion the controversy remained unsettled, and the Governor of Oklahoma threatened to invoke martial law to prevent the closing of the dam unless assurance was obtained that the Federal Works Agency would make good any judgment the State and the Highway Commission might obtain against the Authority. The Governor was unwilling to rely on the prospect that a judgment could be satisfied from the revenues of the project. The Federal Works Agency refused to insure any judgment against the Authority and again told the Authority that it should rely on the alleged oral agreement between the two warring factions. As a result, the Governor on March 13, 1940, declared martial law in the area surrounding the dam site and occupied it with the National Guard. On the following day the Governor obtained an *ex parte* order in a State court restraining further work on the dam. The United States was not a party to this suit, but it did obtain from a Federal district court a temporary restraining order against the Governor and other state officials prohibiting them from interfering with the project by prosecuting their suit in the State court or by the use of military force. Subsequently an interlocutory injunction in terms similar to those contained in the temporary restraining order was ordered by a 3-judge Federal district court. An appeal was taken to the United States Supreme Court which ordered reversal on procedural grounds having nothing to do with the merits of the case and the cause was remanded to the district court for further proceedings, Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800.

Following the decision of the Supreme Court, the Administrator of the Federal Works Agency and an assistant attorney general in charge of the Claims Division of the Department of Justice decided it would be desirable to settle the dispute. Accordingly, a stipulation dated February 21, 1941, was entered into between the United States and the State of Oklahoma. The stipulation was signed by the Special Assistant to the Attorney General of the United States and by the United

States District Attorney for the Northern District of Oklahoma on behalf of the United States. These two officials signed it, except as to the commitment in paragraph 3 referred to infra. The Special Assistant General Counsel of the Federal Works Agency signed the stipulation, without reservation, for the Federal Works Administrator. For the State of Oklahoma the stipulation was signed by the Governor and Attorney General. The members of the State Highway Commission signed for the Commission and the General Counsel of the Grand River Dam Authority signed for the Authority.

Paragraphs one and two of the stipulation provided that the State of Oklahoma would dismiss with prejudice its case against the Authority and the Governor would rescind his order declaring martial law. Paragraph three stated that the Federal Works Agency acting through the Public Roads Administration and the Work Projects Administration would participate in the construction of certain specified roads as set out in finding numbered 11 of the Trial Commissioner's report. In paragraph four the State and the Highway Commission agreed to accept the Grove Bridge, which had been erected at the expense of the Authority, and to perfect its approaches. Paragraph five stated that the State Highway Commission would renounce any claims it had, or might later have, against the Authority on account of any inundation of public lands occasioned by the operation of the project dam to an elevation of 755 feet above mean sea level. Paragraphs six and seven provided that the United States would dismiss with prejudice its suit against the Governor and the State would dismiss its cross-motion filed in the District Court action. The last paragraph, eight, called for the parties to take the necessary formal steps to accomplish the purposes of the stipulation. The stipulation was filed with the United States District Court on February 25, 1941.

The trial commissioner of this court, who heard and received the evidence in this case, has found as a fact that the agents of the United States who signed the stipulation acted as they did with authority, to which the defendant does not take exception.

The controversy in this case centers around a provision in paragraph three of the stipulation which calls for the Federal Works Agency acting through the Work Projects Administration to expend $705,500 on state road projects. On July 30, 1943, the Work Projects Administration was abolished and its unexpended funds transferred to a Treasury account designated as miscellaneous receipts, and on July 1, 1949, the Federal Works Agency went out of operation with its functions being transferred to General Services Administration. Prior to the abolition of the Work Projects Administration there was paid under the stipulation to the State of Oklahoma, $54,480.29. Plaintiff herein claims $652,019.71 as the balance due it from the sums specified in the stipulation.

As we read the brief of the Government, its defenses to any legal or equitable liability on the part of the United States to pay the State of Oklahoma $652,019.71 remaining due under the February 21, 1941, stipulation are as follows: (1) that under a Federal court decision of April 29, 1948 (Tenth Circuit, 168 F.2d 858), it has been determined that the Government has fully performed its obligations and therefore the legal issues have been disposed of; (2) that the State of Oklahoma was fully compensated for any loss of its roads by the building of the Grove Bridge with Authority money; (3) that there was no authority on the part of the Federal Works Agency representative to enter into a stipulation which would pay out money as insurance against interference by the Governor in the building of the dam because of the lack of mutuality of consideration; and (4) that in any event no equitable liability could result since the Governor of Oklahoma used the National Guard to

intimidate officials of the Authority and Federal Government.[1]

Since the Government's pleadings and brief make no mention of the defense of *collateral estoppel,* we can only surmise that such was its intention when it is stated that the legal issues presented in this action have already been disposed of by prior litigation between the two parties. This arises by reason of a suit filed by the United States in the United States District Court for the Northern District of Oklahoma to condemn flowage easements in the dam area from 750 to 755 feet. The State of Oklahoma claimed that it was entitled to compensation for resulting damage to its highways. The United States set up as a defense to any additional payment the February 21, 1941, stipulation which stated that the State of Oklahoma and its Highway Commission forever waived the right to any claim for damages it might have against the Authority occasioned by the operation of the dam project to an elevation of 755 feet above mean sea level. To avert the effect of the stipulation, the State took the position that there had been a partial failure of consideration and that the stipulation was therefore not a bar to the additional damages claimed. The trial judge who heard the case found that there had been no failure of consideration, but that the State was nevertheless entitled to recover because the clause in the stipulation ran between the State and the Authority and not between the State and the United States, and as such did not act as a release by the state of any claim it might acquire against the United States. On appeal the Tenth Circuit reversed the lower court by holding that the stipulation, to which the United States and the State of Oklahoma had been parties, intended to act as a release by the State of all claims it may have as a result of the raising of the flowage to the 755-foot level. This was held to be true even though the United States was not mentioned in that portion of the stipulation. In making this determination the Circuit Court necessarily had to approve the lower court's ruling that there had been no failure of consideration of such a nature that would operate as a ground for rescission or revocation of the stipulation. As we understand the Government's contentions in the instant case, it would have us invoke *collateral estoppel* by judgment to prevent relitigation of the issue as to the Government's failure to pay the consideration recited in the stipulation in return for the State's waiver of claims for highway damage. In other words, since the Circuit Court necessarily held that there was no partial failure of consideration, and this suit is based upon a breach of contract for failure to pay the stipulated consideration, this court is bound by the previous ruling and may not look behind that decision in order to determine if plaintiff has a legal claim.

In a recent decision of this court, Edgar v. United States, Ct.Cl., 171 F. Supp. 243, 248, we held that *collateral estoppel* applied to suits in this court where the issue had been previously determined in a District Court even though the relief sought here was beyond the jurisdiction of that court.[2] Therein we said that:

"* * * although the [district] court is one of limited jurisdiction, if it has the authority to determine the issue within the scope of its jurisdiction, all other courts are estopped from subsequently relitigating the same issue."

There can be no question that the District and Circuit Courts had jurisdiction over the condemnation proceedings brought by the United States to

1. Inasmuch as the defense of duress is applicable only to the equitable claim of plaintiff here, and the court concludes, infra, that plaintiff has a legal claim, no discussion of this point is deemed necessary.

2. A suit against the United States founded on contract for a sum in excess of $10,-000 is without the jurisdiction of the District Courts. 28 U.S.C. § 41(20), now 28 U.S.C.A. § 1346.

which the State of Oklahoma was made a party. In its function of determining just compensation the court had authority to decide whether or not the stipulation was legally binding upon the parties. This the court did, but in so doing did not directly or indirectly rule that the United States had fully performed all of its obligations thereunder. As we read the decision of the Circuit Court the only ruling inherent in the decision was that there had been no failure of consideration sufficient to void the contract. Whether the issue as to the payment of the sum here in suit was raised we have no way of knowing. Counsel does not point to anything in the record which would show whether this was made an issue or not. Absent a showing that a fact or issue has been specifically ruled upon by a sister court, we are not at liberty to invoke *collateral estoppel* by judgment. The only evidence on this point is a quotation in defendant's brief from a letter by the Deputy Attorney General to the Chairman of the Committee on the Judiciary of the United States Senate. The letter purports to quote from an opinion of the United States District Court judge who sat in the condemnation proceedings, but nowhere are we cited to such an opinion in the evidence in this case. In fact, the pleadings in the condemnation proceedings have not been introduced in evidence in this court, nor has a request for a finding in this regard been made. In the absence of proof as to the issue in the prior litigation the doctrine of *collateral estoppel* is inapplicable. That doctrine acts as a bar to relitigation of only those issues *actually* raised and determined, not as to issues which might have been presented. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Southern Maryland Agricultural Ass'n of Prince George's County v. United States, 147 F.Supp. 276, 137 Ct. Cl. 176. It necessarily follows that the plaintiff is not estopped from litigating the issue in this court by the prior judgment in the Tenth Circuit.

Although the defendant has not raised as a defense to plaintiff's legal claim the statute of limitations, the court feels that some mention should be made of it as a possible bar to suit in this court. Under 28 U.S.C. § 2501 a suit must be filed in this court within six years from the time that the claim first accrued. Under the terms of the stipulation here in issue, the time within which Federal funds would be supplied the State was without limitation. In such a case the accrual of a cause of action would normally take place when there had been a demand by the plaintiff and refusal of performance by the defendant. The findings in this case do not show if or when any demand was made by the State of Oklahoma for the United States to participate in road construction to the extent agreed to under the stipulation. The findings do show that the Work Projects Administration, the agency which was actually to perform the Government's obligation, went out of operation in 1943 at which time it made payment of $54,480.29 to the State of Oklahoma. Again the facts are not sufficient to show whether the abolition of the Work Projects Administration was of such nature as to create an anticipatory breach of the stipulation which would set the statute of limitations in motion. Were this not a congressional reference case we would require that the evidence show that the claim sued upon did not in fact accrue more than six years prior to filing suit since the statute of limitations is jurisdictional in this court.

The court is of opinion that but for this possible application of the statute of limitations the plaintiff would be entitled to recover as a matter of law.

As previously pointed out, the stipulation of settlement was entered into for the Government by agents with authority to so act. The stipulation was intended to and did resolve a controversy between the parties as to compensation for highway damage. The Federal Government had a large financial interest in the successful operation of the dam and it was to their advantage to see that noth-

ing impaired the dam's progress or created a drain upon the Authority's resources. We think that this was ample consideration to uphold the validity of the agreement as between the United States and the State of Oklahoma.

■ The defendant's argument that the agreement was not binding on the Government insofar as paragraph three was concerned is without merit. Paragraph three was signed by an agent of the Federal Works Agency with authority to act for the Agency. The benefit to the Government was real in view of its large economic interest in the Authority and the dam project. There is absolutely no evidence that the claim made by the Governor and the State Highway Commission was either frivolous or in bad faith. Thus the forebearance of the Governor and the State Highway Commission to assert its claim for damages against the Authority was adequate consideration for a promise to pay the amounts stipulated. This is so even though the consideration for the promise not to assert a claim came from the United States, a third party, and would seem especially true since the third party had a definite economic interest in the outcome. It necessarily results that the stipulation did not lack mutuality or consideration and is therefore enforceable.

■■ Defendant's further argument that the State's claim for damage to roads was fully satisfied when the Authority paid for the erection of the Grove Bridge is also without merit. As previously stated, the agreement between the State and the Authority respecting the Grove Bridge was at best merely an oral understanding. It was never reduced to writing nor was it approved by the members of either group acting in their official capacity. This fact is persuasive that no binding agreement had actually been entered into and any understanding was merely preliminary to a final contract of settlement. It is a fundamental rule of law that prior negotiations are merged into written contracts, Holmberg v. United States, 91 Ct. Cl. 501; Smith v. Ferguson, 96 Okl. 150, 221 P. 447; Guess v. Miner, 130 Okl. 93, 265 P. 633, and that these negotiations are prohibited by the parol evidence rule from altering the terms of the written contract. Williston on Contracts, Rev. Ed., Vol. III, § 632. Even had there been a prior agreement it was integrated into the stipulation of settlement and would be inoperative to vary the terms of the writing. See Restatement of the Law of Contracts, Vol. I, § 237.

It necessarily follows that the State of Oklahoma, but for the possible bar of the statute of limitations, has a legal claim against the United States. Under the terms of the stipulation the State is entitled to receive $652,019.71 in Federal aid for highway construction. It is the opinion of the court that Congress should make this amount available to the State, together with the requirement that such funds be employed solely for highway projects.

BRYAN, District Judge, sitting by designation, JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.