**BAGGETT TRANSPORTATION COMPANY**

**v.**

**The UNITED STATES.**

No. 335–59.

United States Court of Claims.

July 12, 1963.

Allen D. Rushton, Birmingham, Ala., for plaintiff. James A. Simpson, Birmingham, Ala., was on the briefs.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DURFEE, Judge.

During the years 1949–1952 plaintiff transported some 2400 truckloads of ammunition and explosives for the Navy Department between points in Indiana and Virginia. The Navy promptly paid for this transportation, including freight charges attributable to dunnage used in shoring and supporting the loads. Upon auditing the Government bills of lading, the General Accounting Office determined that dunnage should have traveled free on many of the shipments. Plaintiff voluntarily refunded some of these "overcharges," and the GAO recovered the balance by making deductions from money due plaintiff under other transportation contracts. This recoupment was made within six years of the filing of the petition in this action.

Plaintiff now sues for the money recouped by the GAO. It also sues for additional freight on the ground that it erroneously underbilled the Navy for many of the shipments.

The facts giving rise to these claims are as follow. In 1948 plaintiff learned that the Navy Department expected to be shipping a large volume of ammunition and explosives between the Navy Ammunition Depot at Crane, Indiana and the depot at St. Juliens Creek, Virginia. Plaintiff obtained permission from the Interstate Commerce Commission to submit a Section 22 Quotation (a special type of tariff) to the Navy's Bureau of Supplies and Accounts. 49 U.S.C. § 22. This Quotation, No. 47, was in effect from September 17, 1948 to March 15, 1949. There is no dispute with respect to ammunition carried under this Quotation.

### Quotation No. 52

After Quotation No. 47 expired, the Bureau of Supplies and Accounts sent a telegram to plaintiff asking for a new quotation and assurances that in the event plaintiff submitted the lowest quotation, it would guarantee adequate safety practices. In response to this telegram, plaintiff sent a letter on March 23,

1949, expressing interest in trucking more ammunition. Most of the two-page letter dealt with proposed safety precautions. However, the first paragraph stated that we "herewith submit our bid of $1.60 cwt., *truckload minimum* 20,000 pounds, and/or $1.38 cwt., *volume mini-mum* 50,000 pounds." [1] [Emphasis added.] Subsequent to this letter, the parties orally discussed new rates. The subject of dunnage, however, was not mentioned. Then, in early April 1949 plaintiff submitted Quotation No. 52, as follows:

### "COMMODITY DESCRIPTION

Ammunition and Explosives

| BETWEEN | TRUCK LOAD MINIMUM WEIGHT | RATES IN CENTS PER 100 POUNDS |
|---|---|---|
| St. Juliens Creek, Virginia and within 15 miles thereof | | |
| Portsmouth, Virginia, and within 15 miles thereof | | |
| AND | | |
| Crane, Indiana | 20,000 lbs. | 160 |
| | 50,000 lbs. | 138 |

ROUTE: Baggett Transportation Company
EFFECTIVE: April 15, 1949
EXPIRES: October 11, 1949"

———◆———

In October 1949 plaintiff extended the expiration date of Quotation No. 52 to April 11, 1950.

### Quotation No. 69

During the period Quotation No. 52 was effective, other motor carriers began offering the Government Section 22 Quotations phrased in terms of the going first-class rates. Plaintiff and the Bureau of Supplies and Accounts held oral discussions regarding this new style quotation. Again, dunnage was not mentioned in these discussions, leading to Quotation No. 69, effective November 4, 1949. Two features of Quotation No. 69 are relevant here. First, the proviso for alternative application with the rates in Quotation No. 52:

"ALTERNATIVE APPLICATION

"Rates named in this quotation alternate with rates named in Baggett Transportation Co.'s U.S. Government quotation No. 52, effective 15 April 1949, and charges on any shipment of the same commodity moving between the same points shall not exceed charges determined by use of rates named in Quotation No. 52."

Second, Quotation No. 69 stated that Baggett Transportation Company

" * * * *hereby adopts and makes its own in every respect,* for single line application, Eastern-Central Motor Carriers Association, Agent, Tariff No. 10–A, MF–ICC No. A–38, supplements thereto or reissues thereof * * * as basis for charg-

1. The cost of moving a shipment of ammunition a given distance depended on two factors, other things being equal: (1) the total weight of the shipment and (2) whether a *truckload minimum* or a *volume minimum* rate was applicable. (See finding 2.)

es on shipments of commodities described and moving between the points named above on U.S. Government bills of lading." [Emphasis added.]

Dunnage is clearly dealt with in Quotation No. 69, although this requires us to navigate the labyrinth of its cross-references. Item No. 1000 of Eastern-Central Motor Carriers Association Tariff No. 10–A (incorporated by reference into Quotation No. 69), provides:

"This Tariff is governed, except as otherwise provided herein, by the following Tariffs, viz.:

"A—National Motor Freight Classification No. 9 (East), MF–I.C.C. No. 17, issued by C. F. Jackson, Agent;"

And Rule No. 10 of the National Motor Freight Classification No. 9 states:

"Unless otherwise provided, charges shall be computed on gross weights, *excluding the weight of* temporary flooring, blocking, racks, standards, stakes, or similar bracing, *dunnage or supports.*" [Emphasis added.]

Plaintiff terminated Quotation No. 69 on July 1, 1952.

### Quotation No. 85

This Quotation, in form similar to No. 52, was issued after the rates were agreed upon in oral discussions in which dunnage was not mentioned. It became effective May 24, 1951 and expired May 24, 1952.

### Tender No. 109

Following oral discussions—which again omitted the subject of dunnage—plaintiff issued Tender No. 109, effective May 25, 1952. Accessorial Services were "as provided in E.C.M.C.A. Tariff No. 10–A and 11–A supplements thereto and reissues thereof." Tender No. 109 was in existence at least until November 14, 1952.

Obviously there was some overlapping of these four quotations during the period relevant here, namely, April 15, 1949,

when Quotation No. 52 became effective and November 14, 1952, the date of the last shipment involved. But whenever more than one quotation was available at the time of a shipment of ammunition, the parties computed the charges under each and used the quotation and rate giving the lowest cost. By this method, the Navy received the lowest applicable rate for each shipment.

Although No. 52, itself, expired April 11, 1950, the parties continued to consider it an alternative quotation by reason of its incorporation into Quotation No. 69, which was effective until July 1, 1952. Quotation No. 52 offered rates of $1.60 and $1.38 cwt., based on a "truckload minimum weight" of 20,000 and 50,000 lbs., respectively. However, when the parties were determining the lowest available rate, they computed charges as though Quotation No. 52 offered the alternative rates of $1.60 cwt., based on a *truckload minimum* of 20,000 lbs., but $1.38 cwt., based on a *volume minimum* of 50,000 lbs. And for many of the shipments the charges billed by plaintiff and paid by the Navy were computed at this rate of $1.38 cwt., based on a *volume minimum* of 50,000 lbs.

On all of the shipments between April 15, 1949 and November 14, 1952, the weight of dunnaging material was added to and included in the gross weights on which the charges were billed and paid—just as though dunnage were "cargo." Upon audit—as already mentioned—the GAO determined that dunnage was not cargo and recouped the charges attributable to dunnage. Defendant concedes that plaintiff is entitled to charge for dunnage under Quotation No. 52, but not under Quotations Nos. 69, 85 and 109.

Plaintiff is also suing for additional freight on the ground that it underbilled for many of the shipments made under Quotation No. 52. Plaintiff's argument is that it should not have billed any shipments at $1.38 cwt. based on a *volume minimum* of 50,000 lbs., but should have computed the rate, where applicable, based on a *truckload minimum* of 50,000 lbs.

868

Defendant maintains that Quotation No. 52 is ambiguous and that plaintiff's letter of March 23, 1949 and the conduct of the parties after the quotation was issued shows that the $1.38 rate was based on a *volume minimum,* rather than a *truckload minimum* of 50,000 lbs. But in any event, argues defendant, the claim for additional freight is barred by the statute of limitations, 28 U.S.C. § 2501 (1958), since the transportation services were rendered more than six years before plaintiff's petition was filed.

I

■ The question of whether the rate of $1.38 cwt. in Quotation No. 52 applies in connection with a *truckload minimum or volume minimum* is one of contract interpretation to be decided under Federal law. United States v. County of Allegheny, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); The Padbloc Co. v. United States, Ct.Cl. No. 523–57 (Apr. 5, 1963), and cases cited therein.

■■ A question of tariff interpretation "does not differ in character from that presented when the construction of any other document is in dispute." United States v. Missouri-Kansas-Texas R. R. et al., 194 F.2d 777 (5th Cir. 1952). The parol evidence rule governs here, and if the state and Federal cases are not at odds "federal law" may include relevant state cases. See D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 465–475, 62 S.Ct. 676, 86 L.Ed. 956 (1942), (*concurring opinion*).

■ Defendant puts great reliance on the letter of March 23, 1949, where plaintiff offered the alternative rate of $1.38 cwt. based on a *volume minimum weight* of 50,000 lbs. But any importance of this letter is vitiated by subsequent oral discussions held just before plaintiff submitted Quotation No. 52. Furthermore, "It is a fundamental rule of law that prior negotiations are merged into written contracts * * * and that these negotiations are prohibited by the parol evidence rule from altering the terms of the written contract." Oklahoma v. United States, 173 F.Supp. 349, 146 Ct.Cl. 185, 196 (1959).

■ Quotation No. 52, set out supra, says nothing about a *volume minimum* rate, "and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular one to which the parol evidence is directed. The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks * * *" Thompson v. Libbey, 34 Minn. 374, 26 N.W. 1 (1885). It is difficult to see how Quotation No. 52 could have spelled out more lucidly the conditions under which the alternative rates of $1.60 and $1.38 were applicable. There is no ambiguity here. Consequently, parol evidence will not be considered. Mason v. United States, 169 F.Supp. 507, 144 Ct.Cl. 579 (1959); Western Mach. Co. v. Northwestern Implement Co., 254 F.2d 453, 458 (9th Cir. 1957).

II

■ Although plaintiff's interpretation of Quotation No. 52 is correct, its claim for additional freight is barred by the six year statute of limitations. 28 U.S.C. § 2501 (1958). The rule has long been established that claims for freight accrue when the services are rendered. United States v. Wilder, 13 Wall. 254, 80 U.S. 254, 20 L.Ed. 681 (1871); Southern Pacific Co. v. United States, 67 Ct.Cl. 414, 419 (1929), cert denied, 280 U.S. 567, 50 S.Ct. 26, 74 L.Ed. 620 (1929), and cases cited therein. The claim for freight and the "right to demand payment [accrue] immediately upon the delivery of the property," Southern Pacific Co. supra, 67 Ct.Cl. at p. 420, because at that time the claim can be definitely ascertained and set up, and the carrier can "meet any plea of neglect to perform." L. E. Myers Co. v. United States, 64 F.Supp. 148, 105 Ct.Cl. 459, 478 (1946).

The claim for additional freight is not barred, argues plaintiff, because there was an "open, current, running account against which the statute of limitations did not begin to run until the audit was made and the refund collected. The date

on which the refund was collected was the date on which the statute of limitations began to run with respect to that shipment." (Brief of Plaintiff, p. 13.) The gist of plaintiff's theory is that since all the Government bills of lading were paid subject to audit under 49 U.S.C. § 66 (1958), its claim for freight could not accrue until the proper charges for each shipment were ascertained by the GAO. This argument is not new. As the court said in Southern Pacific Co. supra, 67 Ct.Cl. at p. 420:

> "It will be noted that plaintiff's contention is that it could not bring an action in this court until the accounting officers of the Government had determined the question of the applicable rate to be applied to the shipments. We are unable to agree with this contention."

██ The statute is not tolled while plaintiff awaits audit or even actively pursues any available administrative remedies, unless a "statute requires that a particular administrative remedy must be exhausted * * *", Friedman v. United States, Ct.Cl. No. 377–60, 310 F.2d 381 (1962), cert. denied, Lipp v. United States, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691. See also Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 142 Ct.Cl. 165, 168, (1958), and cases cited.

██ Tying together in the same action, stale claims and timely claims growing out of the same shipments, does not put the former beyond reach of the statute. This was attempted in St. Louis, Brownsville & Mexico Ry. Co. v. United States, 63 Ct.Cl. 103 (1927). Plaintiff had sued for two different sums. The first, $1,407.30, arose out of the carriage, under two transportation requests, of 832 soldiers from Mercedes, Texas, to Fort Snelling, Minnesota. The transportation requests were dated January 23, 1917. Plaintiff tendered a bill for $26,-549.12, based on a per capita fare of $31.91. The disbursing officer decided $29.80 was the proper fare, and reduced the bill to $24,734, or $1,815.12 less than claimed by plaintiff. But because of a clerical error, plaintiff was paid $25,078, or only $1,407.30 less than he billed for. (Two men traveling as livestock attendants were eliminated, accounting for the other $63.82.) The check payable to plaintiff was dated November 23, 1917. The second claim, for $2,070.40, arose out of deductions by the Government as a result of an audit in which the per capita fare for the above transportation was further reduced, from $29.80 to $27.72. The court held that the claim for $1,407.-30 was barred since the cause of action accrued when the transportation was rendered, which was more than six years before plaintiff filed his petition. The claim with respect to the $2,070.40 "would be barred by the statute of limitations of six years but for the fact that the deduction here complained of was not made until 1919."

Here, as in St. Louis, Brownsville & Mexico Ry. Co., supra, there are two separate causes of action, albeit growing out of the same shipment. This is true since evidence to prove one claim would not necessarily prove the other. United States v. Louisville & Nashville R.R. Co.; 221 F.2d 698 (6th Cir. 1955).

██ Even if there were room in the law on accrual of freight claims, plaintiff's theory of the open, running account would seldom seem to find an appropriate fact situation—clearly one does not exist here. Certain running accounts toll the statute of limitations until the account is "stated." Woodward v. Armstrong, 64 App.D.C. 4, 73 F.2d 513 (1934), adequately states the point:

> "It is settled law that where there is a mutual open account between two parties it is implied that they have mutually consented that the items occurring from time to time in favor of the respective parties shall operate as mutual set-offs, and that the shifting balance, when either or both shall call for it, shall be the debt, and for this reason the statute of limitations does not run during such a state of mutual dealings, but only from the date of the last item; and if the last item is within the

statutory period of limitations, it draws after it the items beyond that time."

"But it is generally held essential, in order to constitute such an account as shall fall within the principle in question, that there shall be *mutual open, current dealings and claims subject to a future final balance.*" 6 Williston, Contracts § 2030, at 5696–97 (1938). [Emphasis added.] The requirement of *mutual dealings* would not seem to be met in the case at bar, where the services were all rendered by plaintiff, and the Government's only obligation was to pay for the services as rendered, subject to its right to assure by audit the accuracy of the charges. See 49 U.S.C. § 66 (1958.) "The mere fact that parties have cross-demands against each other," Brown v. Consol. Fisheries Co., 165 F.-Supp. 421, 423 (D.Del.1955)—even where the cross-demands are open, current accounts—does not satisfy the *mutual dealings* requirement. Isthmian S. S. Co. v. United States, 150 F.Supp. 191 (SDNY 1956). "It is essential, also, that the items of the account shall have been regarded as constituting one account *by the parties.*" 6 Williston, Contracts § 2030, at 5697 (1938). [Emphasis added.]

The general rule is that "where the account is all on one side, the cause of action arises from each item as far as the Statute of Limitations is concerned." Brown v. Consol. Fisheries Co., supra, 165 F.Supp. at p. 423. An exception to the rule seems to be found in Missouri, where the statute can be tolled by the one-sided account. See e. g., St. Joseph & G. I. Ry. Co. v. Elwood Grain Co., 199 Mo.App. 432, 203.S.W. 680 (1918).

In Mid-Continent Petroleum Corp. v. Keen, 157 F.2d 310 (8th Cir. 1946), there was a claim for overtime, the labor having been performed over an extended period. In rejecting the running account theory, the court said, 157 F.2d at p. 316, that plaintiff's "cause of action for overtime compensation accrued on each payday." The running account theory was advanced and rejected in Isthmian S. S.

Co. v. United States, 191 F.Supp. 335, 337 (SD NY 1957). Said the court:

"Claims for freight charges and demurrage cannot be considered to constitute a running open mutual account where it appears that as each service was performed it was regarded as an accrued claim for which a bill was presented."

This seems to sum up plaintiff's difficulty, for it, too, billed the Government after each shipment and expected and received payment on that basis.

The running account theory was also advanced and rejected in Chicago, Milw. & St. Paul R.R. Co. v. Frye & Co., 109 Wash. 68, 186 P. 668, 670 (1919):

"It may be admitted that the services were sufficiently continuous, but we see little else to bring it within the statute [providing that the statute of limitations starts running only when the account is stated]. * * * [A]s the shipments were received by defendant, the freight bills were presented, and the defendant paid such of them or such parts of them as it admitted to be correct * * * but the simple fact that from time to time there were disputes or misunderstandings as to the amount due upon a freight shipment * * * and that this is an action embracing all such separate and individual items, does not make it 'a mutual, open and current account' within the statute."

Louisville & Nashville R.R. Co. v. United States, 47 Ct.Cl. 129, 140 (1911), relied upon by plaintiff, is inapposite in an action for additional freight.

Plaintiff's plight is similar to that of the carrier in Hughes Transp. Inc. v. United States, 109 F.Supp. 373 (ED SC 1953), that is, it did not discover its billing error until six years after the services were performed. But here, as in Hughes, supra, 109 F.Supp. at p. 377, "An audit could have been made immediately after the services were performed" which would have disclosed the billing mistake. Plaintiff could hardly

expect the GAO to point out plaintiff's errors in billing. Section 322 of the Transportation Act of 1940, 54 Stat. 955, 49 U.S.C. § 66,[2] was enacted because "Congress was desirous of aiding the railroads to secure prompt payment of their charges." United States v. New York, New Haven & Hartford R.R. Co., 355 U.S. 253, 260, 78 S.Ct. 212, 216, 2 L.Ed.2d 247 (1957). The right reserved to the Government to audit and deduct overpayments is for the protection of the Government, ibid, not the carriers, who can conduct their own audits and sue for additional freight any time within six years.

### III

■ Of course plaintiff's claim for a refund of dunnage charges is not barred, because that cause of action accrued when the deductions were made. Baltimore & Ohio R.R. Co. v. United States, 158 F.Supp. 862, 141 Ct.Cl. 128, 132 (1958); St. Louis, Brownsville & Mexico Ry. Co. v. United States, 63 Ct.Cl. 103 (1927).

Defendant concedes plaintiff's right to dunnage under Quotation No. 52, except when that Quotation applied as an alternative rate by reason of its incorporation into No. 69. Defendant denies plaintiff's right to dunnage on shipments made under Quotations Nos. 69, 85 and 109.

Quotation No. 85 is in a form similar to No. 52, set out supra. Neither mentions dunnage. The rule for dunnage should be the same for both No. 52 and 85; and, indeed, defendant does not deny this.

The negotiations leading to Quotations Nos. 69, 85 and 109 did not cover dunnage. But as already explained above, Quotations Nos. 69 and 109 refer to dunnage by incorporation and cross-reference. No. 69 provides that plaintiff

"hereby adopts and makes its own in every respect" the E.C.M.C.A. Tariff No. 10–A. Tariff No. 10–A is "governed, except as otherwise provided herein, by * * * National Motor Freight Classification No. 9 * * *" Rule No. 10 of this latter tariff specifically states that "charges shall be computed on gross weights, excluding the weight of * * * dunnage or supports." The route may be a bit long, but it was chosen by plaintiff, and the subject of dunnage is dealt with in clear and unambiguous terms at the end. Tender No. 109, similarly, incorporates the E.C.M.C.A. Tariff No. 10–A, and by the same process of incorporation excludes dunnage from gross weights.

Finally, there are two questions with respect to Quotation No. 52. First, was it incorporated into Quotation No. 69 for the life of the latter quotation, or only until No. 52 expired of its own force? The "Alternative Application" provision in Quotation No. 69 which incorporates No. 52 in no way limits the duration of this incorporation. Unless the incorporation were to be effective for the life of No. 69, it would make little sense. First, because Quotation No. 52 would be available as an independent quotation until it expired anyway. And, second, when Quotation No. 69 was issued, No. 52 had less than six months to run before it expired of its own force. It is concluded that Quotation No. 52 was incorporated into No. 69 for the life of the latter, namely, from November 4, 1949 to July 1, 1952.

The second question with respect to Quotation No. 52 is whether its incorporation into No. 69 made it subject to Rule No. 10 of the National Motor Freight Classification No. 9 with respect to dunnage. This question must be answered in the negative. To decide otherwise is to say that the effective rate in

2. This section provides as follows:
   "Payment for transportation of the United States mail and of persons or property for or on behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended, or the Civil Aeronautics Act of 1938, shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier."

No. 52 was lowered when it was incorporated in No. 69. Nothing in No. 69—despite its many cross-references—compels such a result.

Thus, plaintiff was entitled to charge for the weight of dunnage under Quotations Nos. 52 and 85, but not under Nos. 69 and 109. And the right to charge for dunnage under Quotation No. 52 continued through July 1, 1952 because of its incorporation into No. 69.

Plaintiff is entitled to recover, and judgment is entered to that effect, with the amount of recovery to be determined pursuant to Rule 38(c).