Durfee, Judge,
delivered the opinion of the court:
During the years 1949-1952 plaintiff transported some 2400 truckloads of ammunition and explosives for the Navy Department between points in Indiana and Virginia. The Navy promptly paid for this transportation, including *573 freight charges attributable to dunnage used in shoring and supporting the loads. Upon auditing the Government bills of lading, the General Accounting Office determined that dunnage should have traveled free on many of the shipments. Plaintiff voluntarily refunded some of these “overcharges,” and the GAO recovered the balance by making deductions from money due plaintiff under other transportation contracts. This recoupment was made within six years of the filing of the petition in this action.
Plaintiff now sues for the money recouped by the GAO. It also sues for additional freight on the ground that it erroneously underbilled the Navy for many of the shipments.
The facts giving rise to these claims are as follow. In 1948 plaintiff learned that the Navy Department expected to be shipping a large volume of ammunition and explosives between the Navy Ammunition Depot at Crane, Indiana and the depot at St. Juliens Creek, Virginia. Plaintiff obtained permission from the Interstate Commerce Commission to submit a Section 22 Quotation (a special type of tariff) to the Navy’s Bureau of Supplies and Accounts. 49 U.S.C. § 22. This Quotation, No. 47, was in effect from September 17, 1948 to March 15, 1949. There is no dispute with respect to ammunition carried under this Quotation.

Quotation No. 52

After Quotation No. 47 expired, the Bureau of Supplies and Accounts sent a telegram to plaintiff asking for a new quotation and assurances that in the event plaintiff submitted the lowest quotation, it would guarantee adequate safety practices. In response to this telegram, plaintiff sent a letter on March 23, 1949, expressing interest in trucking more ammunition. Most of the two-page letter dealt with proposed safety precautions. However, the first paragraph stated that we “herewith submit our bid of $1.60 cwt., truch-load minimum 20,000 pounds, and/or $1.38 cwt., volume rmnimvum 50,000 pounds.”[1] [Emphasis added.] Subsequent to this letter, the parties orally discussed new rates. *574 The subject of dunnage, however, was not mentioned. Then, in early April 1949 plaintiff submitted Quotation No. 52, as follows:
COMMODITY DESCRIPTION
Ammunition and Explosives
TRUCK LOAD RATES IN MINIMUM CENTS PER BETWEEN WEIGHT 100 POUNDS
St. Juliens Creek, Virginia and within 15 miles thereof
Portsmouth, Virginia, and within 15 miles thereof
AND
Crane, Indiana 20,000 lbs. 160
50,000 lbs. 138
ROUTE: Baggett Transportation Company
EEEECTIVE: April 15, 1949
EXPIRES: October 11, 1949
In October 1949 plaintiff extended the expiration date of Quotation No. 52 to April 11,1950.

Quotation No. 69

During the period Quotation No. 52 was effective, other motor carriers began offering the Government Section 22 Quotations phrased in terms of the going first-class rates. Plaintiff and the Bureau of Supplies and Accounts held oral discussions regarding this new style quotation. Again, dun-nage was not mentioned in these discussions, leading to Quotation No. 69, effective November 4, 1949. Two features of Quotation No. 69 are relevant here. First, the proviso for alternative application with the rates in Quotation No. 52:
ALTERNATIVE APPLICATION
Bates named in this quotation alternate with rates named in Baggett Transportation Co.’s U.S. Government Quotation No. 52, effective 15 April 1949, and charges on any shipment of the same commodity moving between the same points shall not exceed charges determined by use of rates named in Quotation No. 52.
Second, Quotation No. 69 stated that Baggett Transportation Company
* * * hereby adopts and makes its own in every respect, for single line application, Eastern-Central Motor Car *575 riers Association, Agent, Tariff No. 10-A, MF-ICC No. A-38, supplements thereto or reissues thereof * * * as basis for charges on shipments of commodities described and moving between the points named above on TJ.S. Government bills of lading. [Emphasis added.]
Dunnage is clearly dealt with in Quotation No. 69, although this requires us to navigate the labyrinth of its cross-references. Item No. 1000 of Eastern-Central Motor Carriers Association Tariff No. 10-A (incorporated by reference into Quotation No. 69), provides:
This Tariff is governed, except as otherwise provided herein, by the following Tariffs, viz.:
A-National Motor Freight Classification No. 9 (East), MF-I.C.C. No. 17, issued by C. F. Jackson, Agent;
And Rule No. 10 of the National Motor Freight Classification No. 9 states:
Unless otherwise provided, charges shall be computed on gross weights, excluding the weight of temporary flooring, blocking, racks, standards, stakes, or similar bracing, dmvnage or supports. [Emphasis added.]
Plaintiff terminated Quotation No. 69' on July 1,1952.

Quotation No. 85

This Quotation, in form similar to No. 52, was issued after the rates were agreed upon in oral discussions in which dun-nage was not mentioned. It became effective May 24, 1951 and expired May 24,1952.

Tender No. 109

Following oral discussions — which again omitted the subject of dunnage — plaintiff issued Tender No. 109, effective May 25, 1952. Accessorial Services were “as provided in E. C. M.C.A. Tariff No. 10-A and 11-A supplements thereto and reissues thereof.” Tender No. 109 was in existence at least until November 14,1952.
Obviously there was some overlapping of these four quotations during the period relevant here, namely, April 15, 1949, when Quotation No. 52 became effective and November 14, 1952, the date of the last shipment involved. But *576 whenever more than one quotation was available at the time of a shipment of ammunition, the parties computed the charges under each and used the quotation and rate giving the lowest cost. By this method, the Navy received the lowest applicable rate for each shipment.
Although No. 52, itself, expired April 11,1950, the parties continued to consider it an alternative quotation by reason of its incorporation into Quotation No. 69', which was effective until July 1, 1952. Quotation No. 52 offered rates of $1.60 and $1.38 cwt., based on a “truckload minimum weight” of 20,000 and 50,000 lbs., respectively. However, when the parties were determining the lowest available rate, they computed charges as though Quotation No. 52 offered the alternative rates of $1.60 cwt., based on a trucldoad, minimum of 20,000 lbs., but $1.38 cwt., based on a volume minirrmm of 50,000 lbs. And for many of the shipments the charges billed by plaintiff and paid by the Navy were computed at this rate of $1.38 cwt., based on a voi/ume minimum of 50,000 lbs.
On all of the shipments between April 15,1949 and November 14, 1952, the weight of dunnaging material was added to and included in the gross weights on which the charges were billed and paid — just as though dunnage were “cargo.” Upon audit — as already mentioned — the GAO determined that dunnage was not cargo and recouped the charges attributable to dunnage. Defendant concedes that plaintiff is entitled to charge for dunnage under Quotation No. 52, but not under Quotations Nos. 69,85 and 109.
Plaintiff is also suing for additional freight on the ground that it underbilled for many of the shipments made under Quotation No. 52. Plaintiff’s argument is that it should not have billed any shipments at $1.38 cwt. based on a volume minimum of 50,000 lbs., but should have computed the rate, where applicable, based on a trucldoad minimum of 50,000 lbs.
Defendant maintains that Quotation No. 52 is ambiguous and that plaintiff’s letter of March 23,1949 and the conduct of the parties after the quotation was issued shows that the $1.38 rate was based on a volume minimum, rather than a trucldoad minimum of 50,000 lbs. But in any event, argues *577 defendant, the claim for additional freight is barred by the statute of limitations, 28 U.S.'C. §2501 (1958), since the transportation services were rendered more than six years before plaintiff’s petition was filed.
I
The question of whether the rate of $1.38 cwt. in Quotation No. 52 applies in connection with a trucTcload minimum or volume minimum is one of contract interpretation to be decided under Federal law. United States v. County of Allegheny, 322 U.S. 174, 183 (1944); The Padbloc Co. v. United States, 161 Ct. Cl. 369 (1963), and cases cited therein.
A question of tariff interpretation “does not differ in character from that presented when the construction of any other document is in dispute.” United States v. Missouri-Kansas-Texas R. R. et al., 194 F. 2d 777 (5th Cir. 1952). The parol evidence rule governs here, and if the state and Federal cases are not at odds “federal law” may include relevant state cases. See D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 465-75 (1942), (concurring opinion).
Defendant puts great reliance on the letter of March 23, 1949, where plaintiff offered the alternative rate of $1.38 cwt. based on a volume minimum weight of 50,000 lbs. But any importance of this letter is vitiated by subsequent oral discussions held just before plaintiff submitted Quotation No. 52. Furthermore, “It is a fundamental rule of law that prior negotiations are merged into written contracts * * * and that these negotiations are prohibited by the parol evidence rule from altering the terms of the written contract.” Oklahoma v. United States, 146 Ct. Cl. 185, 196, 173 F. Supp. 349 (1959).
Quotation No. 52, set out supra, says nothing about a volume mmimurn rate, “and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular one to which the parol evidence is directed. The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks * * *” Thompson v. Libbey, 34 Minn. 374, 26 N.W. 1 (1885). It is difficult to see how Quotation No. 52 could *578 have spelled out more lucidly the conditions under which the alternative rates of $1.60 and $1.38 were applicable. There is no ambiguity here. Consequently, parol evidence will not be considered. Mason v. United States, 144 Ct. Cl. 579, 169 F. Supp. 507 (1959); Western Mach. Co. v. Northwestern Implement Co., 254 F. 2d 453, 458 (9th Cir. 1957).
II
Although plaintiff’s interpretation of Quotation No. 52 is correct, its claim for additional freight is barred by the six year statute of limitations. 28 U.S.C. §2501 (1958). The rule has long been established that claims for freight accrue when the services are rendered. United States v. Wilder, 80 U.S. 254 (1871); Southern Pacific Co. v. United States, 67 Ct. Cl. 414, 419 (1929), cert denied, 280 U.S. 567 (1929), and cases cited therein. The claim for freight and the “right to demand payment [accrue] immediately upon the delivery of the property,” Southern Pacific Co. supra., at p. 420, because at that time the claim can be definitely ascertained and set up, and the carrier can “meet any plea of neglect to perform.” L. E. Myers Co. v. United States, 105 Ct. Cl. 459, 478, 64 F. Supp. 148 (1946).
The claim for additional freight is not barred, argues plaintiff, because there was an “open, current, running account against which the statute of limitations did not begin to run until the audit was made and the refund collected. The date on which the refund was collected was the date on which the statute of limitations began to run with respect to that shipment.” (Brief of Plaintiff, p. 13.) The gist of plaintiff’s theory is that since all the Government bills of lading were paid subj ect to audit under 49 U.S.C. §66 (1958), its claim for freight could not accrue until the proper charges for each shipment were ascertained by the GAO. This argument is not new. As the court said in Southern Pacific Co. supra, at p. 420:
It will be noted that plaintiff’s contention is that it could not bring an action in this court until the accounting officers of the Government had determined the question of the applicable rate to be applied to the shipments. We are unable to agree with this contention.
*579 The statute is not tolled while plaintiff awaits audit or even actively pursues any available administrative remedies, unless a “statute requires that a particular administrative remedy must be exhausted * * Friedman v. United States, 159 Ct. Cl. 1, 310 F. 2d 381 (1962), cert. denied, 373 U.S. 932. See also Empire Institute of Tailoring, Inc. v. United States, 142 Ct. Cl. 165, 168, 161 F. Supp. 409 (1958), and cases cited.
Tying together in the same action, stale claims and timely claims growing out of the same shipments, does not put the former beyond reach of the statute. This was attempted in St. Louis, Brownsville & Mexico Ry. v. United States, 63 Ct. Cl. 103 (1927). Plaintiff had sued for, two different sums. The first, $1,407.30, arose out of the carriage, under two transportation requests, of 832 soldiers from Mercedes, Texas, to Fort Snelling, Minnesota. The transportation requests were dated January 23, 1917. Plaintiff tendered a bill for $26,549.12, based on a per capita fare of $31.91. The disbursing officer decided $29.80 was the proper fare, and reduced the bill to $24,734, or $1,815.12 less than claimed by plaintiff. But because of a clerical error, plaintiff was paid $25,078, or only $1,407.30 less than he billed for. (Two men traveling as livestock attendants were eliminated, accounting for the other $63.82.) The check payable to plaintiff was dated November 23, 1917. The second claim, for $2,070.40, arose out of deductions by the Government as a result of an audit in which the per capita fare for the above transportation was further reduced, from $29.80 to $27.72. The court held that the claim for $1,407.30 was barred since the cause of action accrued when the transportation was rendered, which was more than six years before plaintiff filed his petition. The claim with respect to the $2,070.40 “would be barred by the statute of limitations of six years but for the fact that the deduction here complained of was not made until 1919.”
Here, as in St. Louis, Brownsville & Mexico Ry., supra, there are two separate causes of action, albeit growing out of the same shipment. This is true since evidence to prove one claim would not necessarily prove the other. United *580 States v. Louisville & Nashville R.R., 221 F. 2d 698 (6th. Cir. 1955).
Even if there were room in the law on accrual of freight claims, plaintiff’s theory of the open, running account would seldom seem to find an appropriate fact situation — clearly one does not exist here. Certain running accounts toll the statute of limitations until the account is “stated.” Woodward v. Armstrong, 73 F. 2d 513 (DC Cir. 1931), adequately states the point:
It is settled law that where there is a mutual open account between two parties it is implied that they have mutually consented that the items occurring from time to time in favor of the respective parties shall operate ■ as mutual setoffs, and that the shifting balance, when either or both shall call for it, shall be the debt, and for this reason the statute of limitations does not run during such a state of mutual dealings, but only from the date of the last item; and if the last item is within the statutory period of limitations, it draws after it the items beyond that time.
“But it is generally held essential, in order to constitute such an account as shall fall within the principle in question, that there shall be mutual open, current dealings and claims subject to a future final balance.” 6 Williston, Oontracts §2030, at 5696-97 (1938). [Emphasis added.] The requirement of mutual dealings would not seem to be met in the case at bar, where the services were all rendered by plaintiff, and tbe Government’s only obligation was to pay for the services as rendered, subject to its right to assure by audit the accuracy of the charges. See 49 U.S.C. §66 (1958). “The mere fact that parties have cross-demands against each other,” Brown v. Consol. Fisheries Co., 165 F. Supp. 421, 423 (D. Del. 1955) — even where the cross-demands are open, current accounts — does not satisfy the mutual dealings requirement. Isthmian S. S. Co. v. United States, 150 F. Supp. 191 (SD NY 1956). “It is essential, also, that the items of the account shall have been regarded as constituting one account by the parties." 6 Williston, Contracts § 2030, at 5697 (1938). [Emphasis added.]
The general rule is that “where the account is all on one side, the cause of action arises from each item as far as the *581 Statute of Limitations is concerned.” Brown v. Consol. Fisheries Co., supra, at p. 423. An exception to the rule seems to be found in Missouri, where the statute can be tolled by the one-sided account. See e.g., St. Joseph & G. I. Ry. v. Elwood Grain Co., 199 Mo. App. 432, 203 S.W. 680 (1918).
In Mid-Continent Petroleum Corp. v. Keen, 157 F. 2d 310 (8th Cir. 1946), there was a claim for overtime, the labor having been performed over an extended period. In rejecting the running account theory, the court said, at p. 316, that plaintiff’s “cause of action for overtime compensation accrued on each payday.” The running account theory was advanced and rejected in Isthmian S. S. Co. v. United States, 191 F. Supp. 335, 337 (SD NY 1957). Said the court:
Claims for freight charges and demurrage cannot be considered to constitute a running open mutual account where it appears that as each service was performed it was regarded as an accrued claim for which a bill was presented.
This seems to sum up plaintiff’s difficulty, for it, too, billed the Government after each shipment and expected and receive payment on that basis.
The running account theory was also advanced and rejected in Chicago, Milw. & St. Paul R.R. v. Frye & Co., 109 Wash. 68, 186 P. 668, 670 (1919) :
It may be admitted that the services were sufficiently continuous, but we see little else to bring it within the statute [providing that the statute of limitations starts running only when the account is stated]. * * * [A]s the shipments were received by defendant, the freight bills were presented, and the defendant paid such of them or such parts of them as it admitted to be correct * * * but the simple fact that from time to time there were disputes or misunderstandings as to the amount due upon a freight shipment * * * and that this is an action embracing all such separate and individual items, does not make it “a mutual, open and current account” within the statute.
The Louisville & Nashville R.R. v. United States, 47 Ct. Cl. 129, 140 (1911), relied upon by plaintiff, is inapposite in an. action for additional freight.
*582 Plaintiff’s plight is similar to that of the carrier in Hughes Transp. Inc. v. United States, 109 F. Supp. 373 (ED SC 1953), that is, it did not discover its billing error until six years after the services were performed. But here, as in Hughes, supra, at p. 377, “An audit could have been made immediately after the services were performed” which would have disclosed the billing mistake. Plaintiff could hardly expect the GAO to point out plaintiff’s errors in billing. Section 322 of the Transportation Act of 1940, 54 Stat. 955, 49 U.S.C. § 66,[2] was enacted because “Congress was desirous of aiding the railroads to secure prompt payment of their charges.” United States v. New York, New Haven & Hartford R.R., 355 U.S. 253, 260 (1957). The right reserved to the Government to audit and deduct overpayments is for the protection of the Government, ibid, not the carriers, who can conduct their own audits and sue for additional freight any time within six years.
Ill
Of course plaintiff’s claim for a refund of dunnage charges is not barred, because that cause of action accrued when the deductions were made. The Baltimore & Ohio R.R. v. United States, 141 Ct. Cl. 128, 132, 158 F. Supp. 862 (1958); St. Louis, Brownsville & Mexico Ry. v. United States, 63 Ct. Cl. 103 (1927).
Defendant concedes plaintiff’s right to dunnage under Quotation No. 52, except when that Quotation applied as an alternative rate by reason of its incorporation into No. 69. Defendant denies plaintiff’s right to dunnage on shipments made under Quotations Nos. 69, 85 and 109.
Quotation No. 85 is in a form similar to No. 52, set out supra. Neither mentions dunnage. The rule for dunnage should be the same for both No. 52 and 85; and, indeed, defendant does not deny this.
The negotiations leading to Quotations Nos. 69, 85 and 109 *583 did not cover dunnage. But as already explained above, Quotations Nos. 69 and 109 refer to dunnage by incorporation and cross-reference. No. 69 provides that plaintiff “hereby adopts and makes its own in every respect” the E.C.M.C.A. Tariff No. 10-A. Tariff No. 10-A is “governed, except as otherwise provided herein, by * * * National Motor Freight Clasification No. 9 * * *” Buie No. 10 of this latter tariff specifically states that “charges shall be computed on gross weights, excluding the weight of * * * dunnage or supports.” The route may be a bit long, but it was chosen by plaintiff, and the subject of dunnage is dealt with in clear and unambiguous terms at the end. Tender No. 109, similarly, incorporates the E.C.M.C.A. Tariff No. 10-A, and by the same process of incorporation excludes dun-nage from gross weights.
Finally, there are two questions with respect to Quotation No. 52. First, was it incorporated into Quotation No. 69 for the life of the latter quotation, or only until No. 52 expired of its own force? The “Alternative Application” provision in Quotation No. 69 which incorporates No. 52 in no way limits the duration of this incorporation. Unless the incorporation were to be effective for the life of No. 69, it would make little sense. First, because Quotation No. 52 would be available as an independent quotation until it expired anyway. And, second, when Quotation No. 69 was issued, No. 52 had less than six months to run before it expired of its own force. It is concluded that Quotation No. 52 was incorporated into No. 69 for the life of the latter, namely, from November 4, 1949 to July 1, 1952.
The second question with respect to Quotation No. 52 is whether its incorporation into No. 69 made it subject to Buie No. 10 of the National Motor Freight Classification No. 9 with respect to dunnage. This question must be answered in the negative. To decide otherwise is to say that the effective rate in No. 52 was lowered when it was incorporated in No. 69. Nothing in No. 69 — despite its many cross-references— compels such a result.
Thus, plaintiff was entitled to charge for the weight of dunnage under Quotations Nos. 52 and 85, but not under Nos. 69 and 109. And the right to charge for dunnage un *584 der Quotation No. 52 continued through. July 1,1952 because of its incorporation into No. 69.
Plaintiff is entitled to recover, and judgment is entered to that effect, with the amount of recovery to be determined pursuant to Rule 38 (c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) The plaintiff is a corporation organized and existing under the laws of the State of Alabama.
(b) At all times and for all purposes pertinent to this litigation, the plaintiff was a carrier by motor vehicle of ammunition and explosives in interstate commerce under permits from the Interstate Commerce Commission. In its interstate operations during such period, the plaintiff was a contract carrier and was not a common carrier.[1]

Explanation of Terms

2. (a) As the terms “shipment,” “truckload minimum weight,” and “volume minimum weight” will be used in subsequent findings, explanations concerning them are set out in the succeeding paragraphs of this finding.
(b) A shipment is an amount of freight received by a carrier from one shipper at one time and at one place for movement to one consignee at one destination on one bill of lading.
(c) Where a carrier by motor vehicle fixes for its services in transporting goods between certain points a rate in cents per hundred pounds, coupled with a truckload minimum weight limitation, the charge for transporting a shipment is to be computed separately with respect to each vehicle utilized in moving the shipment; and if a particular vehicle carries less than the amount stated in the truckload minimum weight limitation, the charge for that vehicle will nevertheless be computed as though it had actually carried such *585 minimum weight. For example, if a carrier has fixed a rate of $1.50 per hundred pounds, coupled with a truckload minimum weight limitation of 25,000 pounds, and two trucks have been used by the carrier in moving a shipment totaling 50,000 pounds, one truck having carried 80,000 pounds of cargo and the other truck having carried 20,000 pounds of cargo, the charge for transporting the shipment will be computed by multiplying 300 hundred-pound units by $1.50 for the first truck, resulting in a charge of $450, and by multiplying 250 hundred-pound units by $1.50 for the second truck (although the second truck actually carried only 200 hundred-pound units), resulting in a charge of $375, so that the total charge for transporting the 50,000-pound shipment will be $825.
(d) Where a carrier by motor vehicle fixes for its services in transporting goods between certain points a rate in cents per hundred pounds, coupled with a volume minimum weight limitation, the charge for transporting a shipment is to be computed without regard to the number of vehicles used in effecting the movement; and the minimum charge will be the result of multiplying the rate by the number of hundred-pound units mentioned in the volume minimum weight limitation, even though the total weight of a shipment may actually be less than such minimum. For example, if a carrier has a fixed rate of $1.25 per hundred pounds, coupled with a volume minimum weight limitation of 60,000 pounds, and a shipment weighing a total of 50,000 pounds has been transported by the carrier for a shipper, the charge for the movement (irrespective of the number of vehicles used) is to be computed by multiplying 600 hundred-pound units by $1.25, so that the charge will be $750 (although the shipment actually consisted of only 500 hundred-pound units).
(e) Where a carrier by motor vehicle fixes for its services in transporting goods between certain points a rate in cents per hundred pounds coupled with a truckload minimum weight limitation, and another rate in cents per hundred pounds coupled with a volume minimum weight limitation, such rates are available to a shipper in the alternative, and the shipper can utilize the rate that will produce the lower charge for the movement of a particular shipment. For ex *586 ample, if a carrier has fixed a rate of $1.50 per hundred pounds coupled with a truckload minimum weight limitation of 25,000 pounds, and also a rate of $1.25 per hundred pounds coupled with a volume minimum weight limitation of 60,000 pounds, and if two trucks have been used in moving a shipment totaling 50,000 pounds, one truck having carried 30,000 pounds of cargo and the other truck having carried 20,000 pounds of cargo, the shipper would have the option of utilizing the rate of $1.50 per hundred pounds coupled with the truckload minimum weight limitation of 25,000 pounds, which would result in a charge of $825 (see paragraph (c) of this finding), or of utilizing the alternative rate of $1.25 per hundred pounds coupled with the volume minimum weight limitation of 60,000 pounds, which would result in a charge of $750 (see paragraph (d) of this finding).
(f) Where a carrier by motor vehicle fixes for its services in transporting goods between certain points a rate in cents per hundred pounds coupled with a truckload minimum weight limitation, and another rate in cents per hundred pounds coupled with a truckload minimum weight limitation different from the first limitation mentioned, such rates are available to a shipper in the alternative, and the shipper can utilize the rate that will produce the lower charge for the movement of a particular shipment. For example, if a carrier has fixed a rate of $1.50 per hundred pounds coupled with a truckload minimum weight limitation of 25,000 pounds, and also a rate of $1.25 per hundred pounds coupled with a truckload minimum weight limitation of 35,000 pounds, and if a single truck has been used in moving a shipment totaling 30,000 pounds, the shipper would have the option of utilizing the rate of $1.50 per hundred pounds coupled with the truckload minimum weight limitation of 25,000 pounds, which would result in a charge of $150 (the result of multiplying 300 hundred-pound units by $1.50), or of utilizing the alternative rate of $1.25 per hundred pounds coupled with the truckload minimum weight limitation of 35,000 pounds, which would result in a charge of $437.50 (the result of multiplying 350 hundred-pound units by $1.25, although only 300 hundred-pound units were actually moved).

*587
The Quotations

3. In connection with, its solicitation of business from various agencies of the United States, the plaintiff learned sometime in 1948 that the Navy Department expected to have a considerable volume of ammunition and explosives for movement between the Navy Ammunition Depot at Crane, Indiana, and the Navy Ammunition Depot at St. Juliens Creek, Virginia. St. Juliens Creek is within 10 miles of Portsmouth, Virginia. At the time when the plaintiff first obtained this information, it did not have any authority from the Interstate Commerce Commission for the transportation of ammunition and explosives in interstate commerce, but the plaintiff, believing such authority necessary, soon applied to the Interstate Commerce Commission for such authority on a temporary basis. The plaintiff’s application was supported by the Navy Department, and the temporary authority applied for was granted by the Interstate Commerce Commission. After the plaintiff obtained such authority, it submitted to the Bureau of Supplies and Accounts of the Navy Department on or before September 17, 1948, a quotation under Section 22 of the Interstate Commerce Act (49 U.S.C. § 22) respecting a rate on the transportation of ammunition and explosives between the Navy Ammunition Depot at Crane, Indiana, and the Navy Ammunition Depot at St. Juliens Creek, Virginia. This quotation, designated as Quotation No. 47, was as follows:
COMMODITY DESCRIPTION
Ammunition and Explosives
BETWEEN
TRUCK LOAD MINIMUM WEIGHT
RATES IN CENTS PER 100 POUNDS
Navy Ammunition Depot
Crane (Martin County)
Indiana.
AND
Navy Ammunition Depot 25,000 lbs. 161
St. Juliens Creék,
Virginia.
ROUTE: Baggett Transportation Company
EFFECTIVE: September 17,1948
EXPIRES: Mar. 15,1949
*588 4. No claim is asserted by the plaintiff in the present litigation on the basis of having hauled ammunition and explosives for the Navy Department under Quotation No. 47.
5. Following the expiration of Quotation No. 47 on March 15,1949, it appeared to the Navy Department that the movement of ammunition and explosives between the Navy Ammunition Depot at Crane, Indiana, and the Navy Ammunition Depot at St. Juliens Creek, Virginia, would continue. Accordingly, the Bureau of Supplies and Accounts of the Navy Department sent the following telegram (in the form of a night letter) to the plaintiff on March 18, 1949:[2]
NAVY REQUIRES MOTOR CARRIER SERVICE FOR TRANSPORTATION AMMUNITION AND EXPLOSIVES BETWEEN NAVAL AMMUNITION DEPOTS CRANE INDIANA AND ST. JULIENS CREEK PORTSMOUTH VIRGINIA X IE YOU ARE INTERESTED ADVISE RATE AT WHICH YOU ARE WILLING TO PERFORM AND IP YOU WILL GUARANTEE ADEQUATE SAFETY PRACTICES WILL BE ESTABLISHED AND FOLLOWED IN SAID TRANSPORTATION X DETAILS OF PRACTICES TO BE ESTABLISHED MUST BE INCLUDED IN YOUR QUOTATION X NAVY WILL SELECT CARRIER OFFERING BEST RATE AND SAFEGUARDS X SAFEGUARDS CONSIDERED PARAMOUNT X AND WILL SUPPORT APPLICATION TO ICO FOR TA X MUST HAVE REPLY NOT LATER THAN 24 MARCH 1949 X
6. (a) In response to the telegram quoted in finding 5, the president of the plaintiff on March 23, 1949, transmitted a special delivery letter by air mail to the Bureau of Supplies and Accounts of the Navy Department. The first paragraph of this letter was as follows:
We are interested in the movement of ammunition and explosives between Naval Ammunition Depots Crane, Indiana and St. Juliens Creek, Portsmouth, Virginia and herewith submit our bid of $1.60 cwt., truckload minimum 20,000 pounds, and/or $1.38 cwt., volume minimum 50,000 pounds.
(b) The letter referred to in paragraph (a) of this finding was a 2-page letter that consisted of nine paragraphs. Except for the first paragraph, the letter dealt with the mat *589 ter of the safety practices that would be established and followed by the plaintiff if it obtained the business of transporting for the Navy Department ammunition and explosives between the points mentioned in the letter.
(c) The evidence in the record does not indicate to what extent, if any, the Navy Department considered and relied on the first paragraph of the letter from the plaintiff’s president dated March 23,1949, in connection with the transactions that are involved in the present litigation.
7. (a) Following the exchange of correspondence referred to in findings 5 and 6, oral discussions took place between representatives of the plaintiff and of the Bureau of Supplies and Accounts of the Navy Department. There is nothing in the evidence to indicate that the first paragraph of the letter dated March 23, 1949, from the plaintiff’s president (see finding 6(a)) was considered by the representatives of the parties during the course of these discussions. The subject of dunnage was not discussed. On the basis of the discussions mentioned in this paragraph, the representatives of the parties reached an understanding to the effect that the plaintiff would submit to the Navy Department a new quotation to replace the expired Quotation No. 47; and that the new quotation would set out two alternative rates, one in the amount of $1.60 per 100 pounds coupled with a truckload minimum weight limitation of 20,000 pounds, and the other in the amount of $1.38 per 100 pounds coupled with a truckload minimum weight limitation of 50,000 pounds.
(b) Thereafter, the plaintiff in April 1949, and not later than April 15, 1949, submitted to the Bureau of Supplies and Accounts of the Navy Department a new quotation under Section 22 of the Interstate Commerce Act respecting a rate on the transportation of ammunition and explosives between Crane, Indiana, and the St. Juliens Creek-Portsmouth area of Virginia. This quotation, designated as Quotation No. 52, was as follows:
*590 COMMODITY DESCRIPTION
Ammunition, and Explosives
BETWEEN
TRUCK LOAD MINIMUM WEIGHT
RATES IN CENTS PER 100 POUNDS
St. Juliens Creek, Virginia and within 15 miles thereof
Portsmouth, Virginia and within 15 miles thereof
AND
Crane, Indiana 20, 000 lbs 160
50, 000 lbs 138
ROUTE: Baggett Transportation Company
EFFECTIVE: April 15, 1949
EXPIRES : October 11, 1949
(c) In connection with the submission of Quotation No. 52 to the Navy Department, the plaintiff obtained from the Interstate Commerce Commission new authority for the transportation of ammunition and explosives between the points mentioned in Quotation No. 52.
8. Sometime prior to October 11,1949, the plaintiff issued to the Bureau of Supplies and Accounts of the Navy Department Supplement No. 1 to Quotation No. 52, extending the expiration date of that quotation to April 11,1950.
9. While Quotation No. 52 was in existence, motor carriers began to quote to the Government under Section 22 of the Interstate Commerce Act rates that were phrased in terms of percentages of the going first-class rates. The plaintiff decided that it would offer to the Navy Department a new quotation along that line; and the terms of such a quotation were orally discussed by representatives of the plaintiff and of the Bureau of Supplies and Accounts, Navy Department. The subject of dunnage was not discussed during the conversations. An oral understanding was reached regarding the percentages of the first-class rates that would be offered in the new quotation, and regarding the tariff that would be referred to in the new quotation for the purpose of identifying the first-class rates. In pursuance of the oral understanding, the plaintiff on or before November 4, 1949, submitted to the Bureau of Supplies and Accounts of the Navy Department a new quotation under Section 22 of the *591 Interstate Commerce Act. This quotation, designated as Quotation No. 69, was as follows:
U.S. Government Quotation No. 69 Special quotation applying on U.S. Government freight moving on U.S. Government bills of lading
COMMODITY DESCRIPTION
Explosives, ammunition, and ingredients and component parts of explosives and ammunition, and empty containers tberefor.
TERRITORIAL APPLICATION
Portsmouth, Virginia Naval Air Station,
Between: NavalAmmuni- and Patuxent River, Maryland tion Depot, Indian Head, Maryland, Crane, Ind. and points and places within 10 miles of either.
RATES
Except as provided in Note 1, below, Baggett Transportation Company, Inc., Birmingham, Alabama, a contract carrier, hereby adopts and makes its own in every respect, for single line application, Eastern-Central Motor Carriers Association, Agent, Tariff No. 10-A, MF-ICC No. A-38, supplements thereto or reissues thereof, as basis for charges on shipments of commodities described and moving between the points named above on U.S. Government bills of lading.
Note 1: EXCEPTIONS:
COMMODITIES RATES
All Articles designated as “Dangerous” or “Class A” Explosives in Explosives and Dangerous Articles Tariff No. 6, C. F. Jackson, Agent’s, MF-ICC No. 18, supplements thereto or reissues thereof, in straight or mixed shipments
Volume minimum weight 50,000 pounds_Sixty-five percent
(65%) of applicable first-class rate determined as provided above.
Truckload minimum weight 20,000
pounds-Seventy-five percent
(75%) of applicable first-class rate determined as provided above.
*592 COMMODITIES KATES
Small arms ammunition as described in National Motor Freight Classification No. 10, C. F. Jackson, Agent’s, MF-ICC No. 19, supplements thereto or reissues thereof, and not designated as “Dangerous” or “Class A” Explosives in Explosives and Dangerous Articles Tariff No. 6, C. F. Jackson, Agent’s, MF-ICO No. 18, supplements thereto or reissues thereof, in straight shipments,
Truckload minimum weight 24,000 pounds_Thirty-seven and one-half percent (37%%) of applicable first-class rate determined as provided above.
ALTERNATIVE APPLICATION
Rates named in this quotation alternate with rates named in Bag-gett Transportation Co.’s, U.S. Government Quotation No. 52, effective 15 April 1949, and charges on any shipment of the same commodity moving between the same points shall not exceed charges determined by used [sic] of rates named in Quotation No. 52.
EFFECTIVE AND EXPIRATION DATES
This quotation is effective 4 November 1949 and will remain in effect in [sic] until cancelled, reissued or amended provided, however, that no cancellation, reissuance or amendment providing for higher rates than those named herein will be made on less than 30 days written notice addressed to Navy Department, Bureau of Supplies and Accounts, Transportation Division, STA, Washington 25, D.C.
Baggett Tran sportation Company, Inc.
10. (a) Eastern-Central Motor Carriers Association Tariff No. 10-A, to which, reference was made in Quotation No. 69, provided in part as follows in Item No. 1000:
This Tariff is governed, except as otherwise provided herein, by the following Tariffs, viz.:
A — National Motor Freight Classification No. 9 (East), MF-I.C.C. No. IT, issued by C. F. Jackson, Agent;
(b) Hule 10 of National Motor Freight Classification No. 9 provided as follows:
Unless otherwise provided, charges shall be computed on gross weights, excluding the weight of temporary flooring, blocking, racks, standards, stakes, or similar bracing, dunnage or supports.
*593 11. On or before March 15,1951, and effective on that date, the plaintiff amended the provision in Quotation No. 69 on the subject of territorial application, so that it read as follows for the remainder of the life of that quotation:
TERRITORIAL APPLICATION
Naval Mine Depot, Yorktown, Virginia
Portsmouth, Virginia, and points and places within 35 miles thereof.
and Naval Air Station, Patuxent River, Maryland, and points and places within 10 miles thereof. Between: Naval Ammunition Depot, Crane, Ind
Indian Head, Maryland, and points and places within 10 miles thereof.
12. The authority which the plaintiff held from the Interstate Commerce Commission as of the time when Quotation No. 69 was issued, and as of the time when the territorial application of that quotation was expanded, was sufficiently broad to cover the transportation services offered by the plaintiff in that quotation.
13. Quotation No. 69 was terminated by the plaintiff on July 1,1952.
14. Sometime prior to May 24,1951, representatives of the plaintiff and of the Bureau of Supplies and Accounts, Navy Department, discussed the proposed submission by the plaintiff to the Navy Department of a new quotation under Section 22 of the Interstate Commerce Act. Dunnage was not discussed. The terms of such a new quotation were agreed upon during the course of these oral discussions. In accordance with the oral agreement, the plaintiff on or before May 24, 1951, submitted to the Bureau of Supplies and Accounts of the Navy Department a new quotation under Section 22 of the Interstate Commerce Act. It was designated as Quotation No. 85 and provided as follows:
U.S. Government Quotation No. 85
Special Quotations applying on U.S. Government Freight moving on U.S. Government Bills of Lading
*594 COMMODITY DESCRIPTION
Ammunition, and Explosives
BETWEEN volume minimum WEIGHT RATES IN CENTS PER ioo pounds
Portsmouth, Virginia, and points within 35 miles thereof
AND
Crane, Ind 20, 000 lbs. 191
50,000 lbs. 144
ROUTE: Baggett Transportation Company
EEEECTIVE: May 24, 1951
EXPIRES: May 24, 1952
Baggett Transportation Company
15. (a) Following discussions (which did not involve the subject of dunnage) between representatives of the plaintiff and of the Bureau of Supplies and Accounts, Navy Department, relative to the offering by the plaintiff of new rates to the Navy Department, and in accordance with an oral understanding that was reached during the course of such discussions, the plaintiff on or before May 21, 1952, and effective May 25, 1952, submitted to the Bureau of Supplies and Accounts of the Navy Department an offer, designated as Tender No. 109, with respect to the furnishing of transportation services “Between Portsmouth, Virginia, and points within 35 miles thereof and Crane, Indiana” on “Ammunition, Explosives and/or Fireworks and empty containers therefor.” Alternative rates were offered, as follows:

Minimum, weight Line haul rate or charge

20,000 lbs_191
30, 000 lbs_a_158
(b) In a paragraph under the heading of “Accessorial Services and Rate or Charge,” Tender No. 109 contained the following provision:
as provided in E.C.M.C.A. Tariff No. 10-A and 11-A supplements thereto and reissues thereof
(c) Another paragraph of Tender No. 109 provided as follows:
Except to the extent modified in this tender, the rates or charges are subject to the provisions of the following classifications and tariffs:
*595 N.M.F.C. No. 11
E.C.M.C.A. Tariff No. 10-A and 11-A
Supplements thereto and reissues thereof
16. Tender No. 109 was in existence until October 14,1952, at least.
Shipments Between April 15, 1949, and November 3, 1949
17. During the period between April 15, 1949 (the effective date of Quotation No. 52) and November 3, 1949 (the day before Quotation No. 69 became effective), the plaintiff hauled for the Navy Department numerous shipments of ammunition and explosives between Crane, Indiana, and the St. Juliens Creek-Portsmouth area of Virginia. The charges in connection with the transportation of these shipments were computed by the plaintiff and by the Navy Department as though Quotation No. 52 set out alternative rates of: (1) $1.60 per 100 pounds coupled with a truckload minimum weight limitation of 20,000 pounds; and (2) $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds. The Navy Department was given the benefit of whichever rate produced the lower charge on each separate shipment. Dunnage was included in the various shipment weights on which the charges were billed and paid, as though dunnage constituted cargo. In a number of these transactions, the charges billed by the plaintiff and paid by the Navy Department were computed on the basis of a rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds.
18. Within the period of 6 years immediately preceding the filing of the petition in this case on August 3, 1959, the defendant collected from the plaintiff partial refunds of the charges on shipments referred to in finding 17, including shipments referred to in the last sentence of that finding. These partial refunds covered the amounts that had been paid to the plaintiff for the transportation of dunnage in connection with such shipments, it being the defendant’s contention that dunnage should have been transported free. In some of these instances, the defendant made demand upon the plaintiff for the repayment of, and the plaintiff repaid, the amounts of the chargee for the transportation of dunnage. In other *596 instances, the defendant collected the refunds by making deductions from amounts otherwise due the plaintiff in connection with transportation services performed by the plaintiff for the defendant relative to other shipments not directly involved in this litigation.
19. The plaintiff is seeking in the present action to recover (among other items) the amounts of the refunds mentioned in finding 18. In this connection, the defendant concedes that such refunds as related to charges for the transportation of dunnage in connection with shipments moving between April 15, 1949 (the effective date of Quotation No. 52) and November 3, 1949 (the day before the effective date of Quotation No. 69) were erroneously collected from the plaintiff; and, accordingly, that the plaintiff is entitled in the present action to a judgment covering the amounts of such refunds.

Shipments Between November 1¡,, 19J$, and April 11, 1950

20. During the period between November 4, 1949 (the effective date of Quotation No. 69) and April 11, 1950 (the date on which Quotation No. 52, as extended by Supplement No. 1, was scheduled to expire under its own terms), the plaintiff hauled for the Navy Department numerous shipments of ammunition and explosives between Crane, Indiana, and the St. Juliens Creek-Portsmouth area of Virginia. The charges in connection with such shipments were computed by the plaintiff and by the Navy Department on the basis of Quotation No. 52 and Quotation No. 69 constituting alternative quotations, the Navy Department receiving the benefit of whichever quotation provided the lower charge on each shipment. In this connection, charges were computed by both parties under Quotation No. 52 as though this quotation offered alternative rates of (1) $1.60 per 100 pounds coupled with a truckload minimum weight limitation of 20,000 pounds and (2) $1.88 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds; and the Navy Department was given the benefit of whichever rate produced the lower charge on each separate shipment. Dun-nage was included in the various shipment weights on which the charges were billed and paid, as though dunnage constituted cargo. In a number of these transactions, the charges *597 billed by the plaintiff and paid by the Navy Department were computed on the basis of a rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds.
21. Within the period of 6 years immediately preceding the filing of the petition in this action, the defendant collected from the plaintiff partial refunds of the charges on shipments referred to in finding 20, including shipments referred to in the last sentence of that finding. These partial refunds covered the amounts that had been paid to the plaintiff for the transportation of dunnage in connection with such shipments, it being the defendant’s contention that dunnage should have been transported free. In some of these instances, the defendant made demand upon the plaintiff for the repayment of, and the plaintiff repaid, the amounts of the charges for the transportation of dunnage. In other instances, the defendant collected the refunds by making deductions from amounts otherwise due the plaintiff in connection with transportation services performed by the plaintiff for the defendant relative to other shipments not directly involved iu this litigation.
22. The plaintiff is seeking in the present action to recover (among other items) the amounts of the refunds mentioned in finding 21.

Shipments Between April 12,1950, and July 1,1952

23. During the period between April 12, 1950 (the day after Quotation No. 52, as extended by Supplement No. 1, was scheduled to expire under its own terms) and July 1, 1952 (the date on which Quotation No. 69 was terminated), the plaintiff hauled for the Navy Department numerous shipments of ammunition and explosives between Crane, Indiana, and the St. Juliens Creek-Portsmouth area of Virginia. The charges in connection with such shipments were .computed by the plaintiff and by the Navy Department on the basis of Quotation No. 52 and Quotation No. 69 constituting alternative quotations throughout the entire period; and on the basis of Quotation No. 85 constituting an alternative quotation along with Quotation No. 52 and Quotation No. 69 during the period between May 24, 1951, and May 24, 1952 *598 (tbe respective dates on which Quotation No. 85 became effective and expired); and on the basis of Tender No. 109 constituting an alternative quotation along with Quotation No. 52 and Quotation No. 69 during the period between May 25, 1952 (the effective date of Tender No. 109) and July 1, 1952 (the date on which Quotation No. 69 was terminated) . The Navy Department was given the benefit of whichever quotation provided the lower charge on each shipment. In this connection, charges were computed under Quotation No. 52 by both parties as though this quotation offered alternative rates of (1) $1.60 per 100 pounds coupled with a trucHoad minimum weight limitation of 20,000 pounds and (2) $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds, the Navy Department being given the benefit of whichever rate produced the lower charge on each shipment. Dunnage was included in the various shipment weights on which charges were billed and paid, as though dunnage constituted cargo. In a number of these transactions, the charges billed by the plaintiff and paid by the Navy Department were computed on the basis of a rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds.
24. Within the period of 6 years immediately preceding the filing of the petition in this action, the defendant collected from the plaintiff partial refunds of the charges on shipments referred to in finding 23, including shipments referred to in the last sentence of that finding. These partial refunds covered the amounts that had been paid to the plaintiff for the transportation of dunnage in connection with such shipments, it being the defendant’s contention that dunnage should have been transported free. In some of these instances, the defendant made demand upon the plaintiff for the repayment of, and the plaintiff repaid, the amounts of the charges for the transportation of dunnage. In other instances, the defendant collected the refunds by making deductions from amounts otherwise due the plaintiff in connection with transportation services performed by the plaintiff for the defendant relative to other shipments not directly involved in this litigation.
25. The plaintiff is seeking in the present action to recover *599 (among other items) the amounts of the refunds mentioned in finding 24.

Shipments Between July 2, 1952, and October 14, 1952

26. During the period between July 2,1952 (the day after Quotation No. 69 was terminated by the plaintiff) and November 14,1952 (the date of the last shipment that is involved in this litigation), the plaintiff hauled for the Navy Department numerous shipments of ammunition and explosives between Crane, Indiana, and the St. Juliens Creek-Portsmouth area of Virginia. The charges in connection with such shipments were computed by the plaintiff and by the Navy Department in accordance with the alternative rates set out in Tender No. 109, the Navy Department being given the benefit of whichever rate produced the lower charge on each shipment. Dunnage was included in the various shipment weights on which the charges were billed and paid, as though dunnage constituted cargo.
27. Within the period of 6 years immediately preceding the filing of the petition in this action, the defendant collected from the plaintiff partial refunds of the charges on shipments referred to in finding 26. These partial refunds covered the amounts that had been paid to the plaintiff for the transportation of dunnage in connection with such shipments, it being the defendant’s contention that dunnage should have been transported free. In some of these instances, the defendant made demand upon the plaintiff for the repayment of, and the plaintiff repaid, the amounts of the charges for the transportation of dunnage. In other instances, the defendant collected the refunds by making deductions from amounts otherwise due the plaintiff in connection with transportation services performed by the plaintiff for the defendant relative to other shipments not directly involved in this litigation.
28. The plaintiff is seeking in the present action to recover (among other items) the amounts of the refunds mentioned in finding 27.
29. Quotation No. 52 does not contain a rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 pounds.
*600 30. The plaintiff is seeking in the present action to recover (among other items) the amount of freight it would have received had it not billed the Navy Department for certain shipments under Quotation No. 52 at the rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000.
31. The shipments under Quotation No. 52 for which the plaintiff billed the Navy Department at the rate of $1.38 per 100 pounds coupled with a volume minimum weight limitation of 50,000 were made during the period of April 22, 1949 to June 30,1952.
CONCLUSION OP LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the amount of recovery to be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on November 1, 1963, that judgment for the plaintiff be entered for $32,980.94.

 The cost of moving a shipment of ammunition a given distance depended on two factors, other things being equal: (1) the total weight of the shipment and (2) whether a truckload minimum or a volume minimum rate was applicable. (See finding 2.)

 This section provides as follows:
Payment for transportation of the united States mail and of persons or property for or on, behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended, or the Civil Aeronautics Act of 1938, shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier.

 The plaintiff, during the period involved in the litigation, was a common carrier in intrastate commerce, within the State of Alabama. In its intrastate business, the plaintiff hauled general commodities, other than explosives, for the public.

 An identical telegram was sent to Thurston Motor Lines, Inc., Wilson, North Carolina.